Argued June 7, complaint dismissed September 23, 1976

# In re Complaint as to the Conduct of
# A., *Accused.*

554 P2d 479

*Walter H. Evans, Jr.,* of Evans & Peek, Portland, argued the cause and filed briefs for the accused.

*Phillip D. Chadsey,* Portland, argued the cause and filed a brief for the Oregon State Bar. With him on the brief were Charles F. Hinkle and Thomas B. Hebert, Portland.

Before Denecke, Chief Justice, and O'Connell, Holman*, Tongue, Howell and Bryson, Justices.

PER CURIAM.

---

*Holman, J., did not participate in the decision of this case.

## PER CURIAM.

This is a disciplinary proceeding initiated by the Oregon State Bar against the accused, wherein the accused is charged with misleading the trial court in a divorce suit. The review committee of the Bar was divided, with three members voting for a reprimand and two members voting to dismiss the charges.

The facts and dates involved are important.

Gordon Goheen, who was the client involved in this case, was married to Alice Goheen and they had three children. Gordon's mother had become senile and incompetent by 1964. Gordon, pursuant to a power of attorney, sold his mother's residence and invested the proceeds in a mutual fund in his own name. He was the only prospective heir. In 1965 Gordon was appointed guardian of his mother's estate in Polk County. In 1966 the Goheens were divorced, but the mother's guardianship funds were not an issue in the divorce and were retained by Gordon. The accused was not involved in any of these proceedings.

The Goheens eventually remarried, but another divorce proceeding was filed in 1971. At that time Gordon first retained the accused who, during interviews with Gordon, found out that he had never filed an inventory of the guardianship assets or taken any other action in connection with the guardianship. The accused also learned that Gordon had applied for welfare payments for his mother and that payments had been made for the mother's support. The accused advised Gordon that he was probably guilty of welfare fraud because his mother's guardianship assets in the mutual fund had not been disclosed in the welfare application. By that time these assets were worth approximately $20,000. The accused instructed his client to terminate the welfare payments, and he began preparing an accounting of the guardianship assets for his client. Shortly thereafter, however, Goheen advised the accused that his mother had died

[ 227 ]

and was buried in Salem. Accused then told Goheen that his mother's estate should be probated so that the guardianship assets could be included in the estate and the welfare payments refunded. Goheen also told the accused that he had already contacted the Public Welfare Commission and made arrangements for repayment of the amounts paid by the Commission. Thereafter, the accused initiated probate proceedings and filed an inventory listing the mutual funds. The guardianship was eventually terminated by transferring the guardianship assets to the mother's estate. The welfare claim was submitted and paid.

The day after the probate proceedings were filed, Gordon's deposition was taken by his wife's attorney in the pending divorce suit. In response to a question, Goheen indicated that he held some mutual funds as his mother's legal guardian, and that he had used some of these funds for her support. He was then asked:

"Q Do you still do that on a regular basis?

"A No, it's not being taken out now. There's been enough of an income I believe that's been able to take care of her payments."

That line of questioning was not pursued any further, and Gordon was not asked whether his mother was alive, the status of her health, or any further questions about her. He did not volunteer the fact that his mother had died.

The divorce suit was heard on October 29, 1971. The primary issues involved custody of the children and the division of the property. Gordon testified as to the parties' respective assets and indicated that the mutual fund, while in his own name, belonged to his mother. Thereafter, the following exchange occurred:

"Q Is any part of that fund being used for your mother's upkeep at this time?

"A No.

"* * * * *

"Q Where is your mother at this time?

"A Salem.
"* * * * *

"THE COURT: If some official from American Express Stock Fund were here and he had your account, what name would it show on that account?

"THE WITNESS: It would show mine, I believe, your Honor.
"* * * * *

"THE COURT: If you are the guardian over your mother's estate, why wouldn't that account show you as the guardian?

"THE WITNESS: I'm afraid that was an oversight on my part, your Honor. Until I met with Mr. Anderson because of this, I had not realized that it should have been such and I find that her name should have also been on that account, the checking account, but I was the only son.

"THE COURT: Have you changed it since learning?

"THE WITNESS: Yes. It's in the process of being changed through the Polk County. Is that correct, Mr. Anderson?

"THE COURT: Tell me what you know.

"THE WITNESS: Yes. Yes. It was when I found that this was legally wrong.

"THE COURT: Is it correct then for the five years plus you have been guardian and you have not filed any inventory that reflected either the checking account or the stock fund account?

"THE WITNESS: For some reason, no, other than with Social Security and the Veterans Administration as far as the money they paid me. I possibly could say — I say this out of my own memory to the best of my knowledge the Court has not required me to make a dollar by dollar account of this.

"THE COURT: Because your mother does not have a husband and because you are the only son, did you enter into any verbal arrangement with her that upon her death, you do just consider this money yours and therefore it wouldn't have to be probated in any way?

"THE WITNESS: Well, the only reason it might have to be probated — yes.

"THE COURT: You made that arrangement with your mother?

[ 229 ]

"THE WITNESS: Yes, that I handle her affairs. That was made, your Honor, back when I was made power of attorney originally — after my father's death she's been mentally, really incapacitated. This is why the home was originally sold because of senility. She had a number of strokes. She would leave things — burn food on the stove.

"THE COURT: Had she died in the interim, you would have treated all of this money as your own? You would not have probated her estate so far as these funds?

"THE WITNESS: I would have probated it only in regards to any debts she might have, but I don't know. I had not thought that far ahead about that type of thing because — I suppose it went as far as it did because I didn't have other brothers or sisters, or anybody to consult. I did it on my own."

Eventually, the trial judge, in an oral decision, awarded custody of the children and the family home to Gordon. To offset the award of the home, he provided that Mrs. Goheen should receive an award of $5,000, plus $1,500 for her interest in their personal property, payable initially in installments, but that "the whole balance will become due and payable upon the death of his mother also provided that if her estate is probated not later than termination of that probate." The court also found that the mutual fund was a gift to Gordon from his mother, and awarded the wife an additional $5,000 judgment "payable on the death of [Gordon's] mother but in no event payable later than five years from the date of the decree."

At the disciplinary hearing the accused testified that he had been concerned about Gordon's statement that his mother was in Salem, because it was apparent from the oral decision that the trial court believed that Mrs. Goheen was still alive. He also testified that after the trial court's decision, he had a talk with his client:

"I told him that I felt that the Judge had obviously drawn the wrong conclusion and misunderstood what his intentions were. Gordon said to me, 'Look, if the examiner had asked me one more question and if he would have asked me whether my mother was alive or

dead, I would have told him.' I said the Judge having misunderstood, I feel that we should clear that up with him. But I did tell him, too, that I felt under the total context of the case that the Judge would be quite critical of him, that in view of the Welfare and conversion problem, I felt the conversion problem wasn't entirely academic, that I thought he ought to know that the Judge would be unpredictable in his outlook. And Gordon said, well, he didn't see where he done any wrong and he wasn't going to take that chance."

Gordon also testified at the hearing and stated that the accused had advised him before the divorce trial that he might be in serious difficulty because of his application for welfare for his mother without disclosing the guardianship assets. He also stated that the accused had advised him to answer all questions truthfully during the divorce suit but not to volunteer. The record indicates that the accused told Gordon that "it was not in his interest to get in a discussion of his mother's affairs on account of the Welfare and on account of the conversion of funds. And he agreed to tell the truth just as it was." Gordon also testified that he did not think his statement about his mother's whereabouts was to the issue in the divorce suit, that he expected further questioning about his mother's condition, that he was sure his wife already knew of his mother's death, and that he had been told not to volunteer. He also stated that he knew he was "vulnerable" because of the welfare fraud.

Apparently the accused and his client believed that if the trial court knew that Gordon's mother was dead and that her estate was being probated, the court, in making its distribution in the divorce suit, would be interested in the amount of claims against the estate and that if this subject were pursued the evidence of the welfare fraud would be revealed. In fact, the trial judge testified that had he known the true facts, he would have inquired about the extent of any claims against the estate, and that if he knew that welfare payments had been made when the estate had sub-

stantial assets, it "would have caused me to react." He also stated that had he known the true facts, he would have increased the award to Mrs. Gordon Goheen.

After the court's oral decision, and after Gordon refused to allow the accused to talk to the judge, the accused discussed his situation with his partner. They both recognized the accused's conflict between his duty to protect the lawyer-client confidentiality and the accused's duty to prevent a fraud upon the court. The accused also called the State Bar office for an opinion on this matter and was told that he would have to submit his question in writing and that it would be referred to the Ethics Committee and passed upon at its next meeting. The situation required a more immediate resolution and so, after some research on his own, the accused apparently made the determination that it would be best to remain silent under these circumstances. The accused then drafted a decree in conformity with the judge's oral decision.

The amended complaint filed by the Bar contained the following charge:[1]

"* * * In the course of that trial, respondent, Gordon G. Goheen misled the Court to believe that his mother, Cecile G. Goheen, was still alive and that he was

---

[1]The complaint also contained a second count charging a separate ethical violation:

"Prior to September 1, 1971, the Accused in the course of representing Gordon G. Goheen learned that Goheen had committed a crime of welfare fraud in violation of ORS 411.630 by falsely representing that his mother, Cecile Dixon Goheen, was without assets and had applied to the State Public Welfare Commission for assistance for her support. As a result of Goheen's representation the State Public Welfare Commission made monthly payments to Cecile Dixon Goheen.

"The Accused, upon learning that his client, Gordon G. Goheen, had made a false application for welfare assistance for Cecile Dixon Goheen, failed to take any action to notify the proper authorities that his client was engaged in a continuing fraud against the State of Oregon and intended to continue to violate the criminal laws of the State of Oregon."

However, the Trial Committee found, and we agree, that accused is clearly not guilty of the charge in Count II, as he advised his client to withdraw claims for welfare benefits for his mother and arranged for the reimbursement of all previous payments.

obligated to provide for her care from income he was receiving from certain stock which his mother had previously transferred to him. This stock, and the income from it, the Court was led to believe, was not then available and might not be available within the immediate subsequent five-year period for use by the respondent, Gordon G. Goheen, to pay the petitioner, Alice C. Goheen, for her share of the marital property upon dissolution of the marriage.

"The Accused, knowing that his client, Gordon G. Goheen, had falsely misled the Court into believing that Cecile G. Goheen was still alive, failed to advise the Court of her death and that his client was no longer under any obligation to use the income from the stocks for the support of his mother."

The Trial Committee made *inter alia* the following findings:

"* * * * *

"10. After the client's testimony, the Court retired to its chambers, and Anderson asked the client to correct or allow him to correct any misunderstanding the judge might have on this point.

"11. The client refused both requests on the grounds that he had told the truth and that the judge did not misunderstand.

"12. When the Court returned to the bench and issued its decree, Anderson realized for the first time that the Court had accepted as true the inference the client's mother was alive.

"* * * * *

"16. Disclosure of the error of the Court by Mr. Anderson to the Court could have exposed the client to criminal fraud prosecution concerning welfare claims to the mother.

"* * * * *

"18. The Court found that the assets of the Fund were owned by client, when in truth the ownership was in the name of the personal representative of the estate of Cecile G. Goheen.

"* * * * *."

However, the Trial Committee found the accused

had violated Disciplinary Rule DR7-102(B) which requires a lawyer to reveal his client's fraud to the Court. The Committee found the rule had been violated by perpetrating

> "a fraud on the Court during the trial by only introducing evidence of the guardianship which would indicate the client's mother was alive and *by not introducing evidence that the mother's estate was being probated especially since Anderson was the Attorney for the personal representative.*" (Emphasis added.)

This finding cannot stand because it was not alleged in the pleading and it was never argued that the accused committed an ethical violation in this fashion. Moreover, counsel for the Bar, after the Trial Committee had made its findings, wrote a letter to the chairman of the Review Committee in which he stated, with commendable frankness:

> "As counsel for the Oregon State Bar I find myself in the unusual position of agreeing with the Accused that the Trial Board's conclusion of law that he violated Disciplinary Rule DR7-102(B) 'by perpetrating a fraud on the Court during the trial by only introducing evidence of the guardianship which would indicate that the client's mother was alive and by not introducing evidence that the mother's estate was being probated, especially since Anderson was the attorney for the personal representative' was unjustified.

> "It is and remains the Bar's position that the Accused violated Disciplinary Rule DR7-102(B) by not withdrawing from the case when he knew that his client had misled the Court.

> "I personally feel the evidence is clear that the Accused was very concerned about the ethical dilemma which his client had placed him in, *but did nothing on his own to mislead the Court as the Trial Board's conclusion states.*

> "While I feel a written reprimand is appropriate for not having withdrawn under the circumstances, *it would be an injustice to the Accused if the basis for the reprimand was that he perpetrated a fraud upon the Court as the result of his own conduct.*" (Emphasis ours.)

After reviewing the evidence, two members of the

Review Committee found that the accused partici-
pated in Gordon's intentional misleading of the court
and that, at the very least, he should have withdrawn
as attorney when he knew that Gordon had misled the
court. They concluded that the prohibition against
disclosing information obtained during the attorney-
client relationship, DR4-101(B), must yield to the rule
prohibiting him from permitting deceit to be practiced
upon the court, DR7-102(B).

Another member of the Review Committee concur-
red in the recommendation of a public reprimand on
the basis that the accused had a duty to insist that his
client permit him to correct the client's deception and,
failing that, to withdraw from the case. He noted that
the accused had an ethical duty to not "blow the
whistle" on his client, but he also felt that the accused
permitted himself to become part of the deception "by
failing to immediately disassociate himself from it."

Two other members of the Review Committee
dissented and filed an opinion which stated, in part:

"In these proceedings the interest of the public is the
paramount consideration. The public has an interest not
only in full and fair disclosure, but also in the mainte-
nance of confidential relationships between attorneys
and clients and complete advocacy of the client's inter-
ests by his lawyer. A lawyer who discloses his client's
secrets or who presents evidence to assist the other side
is as derelict as one who lies to the court.

"This proceeding does not involve a lawyer who lied,
but instead a client who answered questions incom-
pletely. If counsel had intervened he would have been
subject to charges of breach of confidence, and failure to
diligently advocate his client's cause. By not intervening
he is accused in effect of helping to obstruct justice. I
submit that the accused in effect would have been
criticized by someone regardless of what he did."

On appeal to this court, the Bar has reiterated its
position that the evidence in this case does not war-
rant any inference that the accused intentionally
attempted to mislead the court. However, the Bar also

contends that the accused should have either disclosed the true facts to the court or withdrawn as counsel.

It is obvious from the record that the members of the Trial Committee and the Review Board, as well as counsel for the Bar, have several different opinions as to the appropriate ethical conduct in this situation. In our view, this reflects the general disagreement among members of the Bar as to which policy should prevail in this situation—the duty to protect the client's confidences and secrets, or the duty to prevent a fraud on the court.

DR2-110(B)(2) provides for mandatory withdrawal by the lawyer if "he knows or it is obvious that his continued employment will result in violation of a Disciplinary Rule." The only disciplinary rule which the accused is alleged to have violated is DR7-102(B)(1). The latter provides, in effect, that if the lawyer knows that his client has perpetrated a fraud on a tribunal, he shall call upon the client to rectify the same, and if the client refuses, the lawyer is required to reveal the fraud to the tribunal. However, DR4-101 provides that a lawyer shall not knowingly reveal a confidence or secret of his client. The potential conflicts between the requirement to report to the court and the duty to maintain the confidences or secrets of a client are obvious.

A similar case involving this conflict was once before the ABA Committee on Professional Ethics, chaired by H. Drinker, author of Legal Ethics (1953), and is reported in Formal Opinion 287 (June 27, 1953). In that case, the attorney represented the husband in a contested divorce suit. In a subsequent related matter the client advised the attorney he had committed perjury in the first suit, that his wife was aware of it, and that she threatened to disclose the true facts unless support money was forthcoming. The questions posed were: What is the duty of the attorney to the court, and what is the duty of the attorney to the client? The opinion makes it clear that ABA Canons 29

and 41 (the predecessors of DR7-102 requiring the attorney to report the fraud to the court) do not apply to confidences and secrets of a client protected under Canon 37 (now DR4-101 requiring the preservation of the confidences and secrets of a client). The majority opinion stated:

> "* * * We do not consider that either the duty of candor and fairness to the court, as stated in *Canon* 22, or the provisions of *Canon* 29 and 41 above quoted are sufficient to override the purpose, policy and express obligation under *Canon* 37."

Regarding the action to be taken by the lawyer, the committee stated:

> "In the case stated the lawyer should urge his client to make the disclosure, advising him that this is essential to secure for him any leniency in the event of the court's finding out the truth. He should also advise him to tell his wife that he proposes to do so, and thus avoid further blackmail. If the client will not take this advice, the lawyer should have nothing further to do with him, but despite *Canons* 29 and 41, should not disclose the facts to the court or to the authorities. * * *"[2] ABA Opinions on Professional Ethics 637 (1967).

■ This was the only formal opinion bearing on this issue at the time of the conduct in question. In light of this opinion, it certainly could not have been "obvious" at the time of the alleged violation that the accused's continued employment would violate a disciplinary rule, DR7-102(B). As interpreted by Formal Opinion 287, the rule did not require the revelation of the client's misconduct to the court when the disclosure

---

[2]In regard to a companion case, Opinion 287 concludes:

"He should, in due course, endeavor to persuade the client to tell the court the truth and if he refuses to do so should sever his relations with the client, but should not violate the client's confidence. *We yield to none in our insistence on the lawyer's loyalty to the court of which he is an officer. Such loyalty does not, however, consist merely in respect for the judicial office and candor and frankness to the judge. It involves also the steadfast maintenance of the principles which the courts themselves have evolved for the effective administration of justice, one of the most firmly established of which is the preservation undisclosed of the confidences communicated by his clients to the lawyer in his professional capacity.*" (Emphasis added.)

would violate a confidence or secret of his client. Therefore, the accused was not *required* to withdraw under DR2-110(B)(2).

The effect of Formal Opinion 287 is reinforced by ABA's 1974 amendment to DR7-102(B) requiring disclosure by the lawyer to the court.[3] As amended, the rule now reads:

"A lawyer who receives information clearly establishing that (1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal, *except when the information is protected as a privileged communication.*" (Italics denote the amendment.)

In a very recent opinion by the ABA Committee on Professional Ethics, Formal Opinion 341 (1975), the amendment is explained to have been necessary "in order to relieve lawyers of exposure to such diametrically opposed professional duties." The opinion also states:

"One effect of the 1974 amendment to D.R. 7-102(B)(1) is to reinstate the essence of Opinion 287 which had prevailed from 1953 until 1969. It was as unthinkable then as now that a lawyer should be subject to disciplinary action for failing to reveal information which by law is not to be revealed without the consent of the client, and the lawyer is not now in that untenable position. The lawyer no longer can be confronted with the necessity of either breaching his client's privilege at law or breaching a disciplinary rule.
"* * * * *

"The tradition (which is backed by substantial policy considerations) that permits a lawyer to assure a client that information (whether a confidence or a secret) given to him will not be revealed to third parties is so important that it should take precedence, in all the most serious cases, over the duty imposed by D.R. 7-102(B). * * *" 61 ABA Journal 1543, 1544 (1975).

---

[3] Apparently, this amendment has not yet been adopted by the Oregon State Bar Association.

There is, however, one significant omission between Formal Opinion 287 and the recent amendment to DR7-102(B) as explained in Formal Opinion 341. In Opinion 287 it was stated that the lawyer "should have nothing further to do with [a client who refuses to correct the deception]."[4] No similar statement appears either in the amendment to DR7-102(B) or in Formal Opinion 341.[5]

■ However, in 1972 the Oregon State Bar promulgated Opinion 227 of the Opinions of the Committee on Legal Ethics. Opinion 227, which was not yet in existence at the time of the conduct now in question, considered ABA Formal Opinion 287 and apparently interpreted it as calling for the *mandatory* withdrawal of an attorney who finds himself in a position similar to that which was faced by the accused:

> "This Committee recommends a continuation of the tradition of nondisclosure, encouraging the client to permit the lawyer to make the disclosure, informing the client that the lawyer will have to withdraw if there is no disclosure, and then performing as required by withdrawing in the absence of such consent."

Although it is not clear whether this policy reflects the present position of the American Bar Association, in our view it is correct and it should be followed in this state when similar conflicts arise in the future.

■ However, we do not feel that the accused should be disciplined for his failure to withdraw in this case for several reasons. It should be obvious from the above discussion that there has been substantial disagreement in the Bar over which rule takes precedence in this kind of situation—the duty to disclose or the duty to protect the client's confidences and secrets—as well

---

[4] At another point it is suggested that the lawyer "should sever his relations with the client."

[5] It is doubtful that this is merely an oversight, for Opinion 341 quotes other language from the same sentence in Opinion 287 which suggests a withdrawal.

as the proper course of conduct when such a conflict arises.[6] Although Formal Opinion 287, which was in effect at the time, suggests that the lawyer withdraw, there is nothing in that opinion which actually *requires* withdrawal. Moreover, neither the recent amendment to DR7-102(B) nor Formal Opinion 341 makes any mention of any withdrawal requirement.

The record also discloses that the accused made several good faith attempts to ascertain the proper course of action and to conform his own conduct to that standard. Perhaps most importantly, however, the accused was never formally charged with any failure to withdraw as a violation of professional conduct.

In summary, while we wish to emphasize our agreement with the mandatory withdrawal requirement of Opinion 227 of the State Bar, that opinion was not promulgated until after the conduct involving this accused had occurred. Under similar circumstances in the future, members of the Bar will, of course, follow the directions in Opinion 227 and, if the client refuses to allow disclosure, they must withdraw. However, we believe that it would be unfair to discipline the accused for his failure to do so under the circumstances of this case.

Complaint dismissed.

---

[6] *See also* Dissenting Opinion of two members of the Ethics Committee in Formal Opinion 287. *Compare* Rule 11, Code of Trial Conduct of the American College of Trial Lawyers (1971).